**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

|  |  |
|---|---|
| SUSAN KRAUS-SILFEN, on behalf of herself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>ELANCO ANIMAL HEALTH, INC.; CHEWY, INC.; PETCO HEALTH AND WELLNESS COMPANY, INC.; PETMED EXPRESS, INC.; TRACTOR SUPPLY COMPANY, and PETSMART, INC.,<br><br>*Defendants.* | **Case No. 25-cv-168**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Susan Kraus-Silfen, on behalf of herself and all others similarly situated, brings this Action on behalf of consumers and businesses who are direct purchasers of Imidacloprid topical pet products manufactured by Elanco Animal Health, Inc. ("Elanco") and sold into commerce by retailers Chewy, Inc. ("Chewy"), Petco Health and Wellness Company, Inc. ("Petco"), PetMed Express, Inc. ("PetMed"), Tractor Supply Company ("PetSense"), and PetSmart, Inc. ("PetSmart") (the "Retailer Defendants," and together with Elanco, "Defendants") for violations of Section 1 of the Sherman Antitrust Act and for Defendants' conspiracy to monopolize.

## I.    INTRODUCTION

"*If I lose [Elanco], I'll get fired.*"

- Unnamed Co-Conspirator Animal Supply Company

(discussing the need to agree to foreclose competitors

as part of Elanco's anticompetitive scheme)[1]

1.    Elanco, a major healthcare product producer of products for household pets and other animals, manufactures squeeze-on topical tick and flea prevention products designed for cats and dogs.  These products utilize a primary active ingredient called Imidacloprid, which Elanco sells under the brand names Advantage II and K9 Advantix II (hereinafter, the "Advantix Products").[2]  In 2018, manufacturers sold approximately $270 million in Imidacloprid topicals in the United States, with 25% going directly to veterinarian offices and the remainder being sold directly to consumers—primarily by the Retailer Defendants.

2.    Elanco has a near-perfect monopoly approaching 100% of the market share for Imidacloprid topicals, with Elanco conducting 85% of the sales and the remaining 15% conducted by companies that are licensed by or otherwise affiliated with Elanco.[3]

3.    Elanco's dominance stems not from its business acumen or legitimate skill, but from anticompetitive conduct that has yielded higher prices, reduced competition, less choice, and poorer quality Imidacloprid products for direct purchasers, like Plaintiff and class members.

---

[1] Emily Le Coz & Jonathan Hettinger, *'No generics' deals blocked pet owners from cheaper flea-and-tick treatment, lawsuit claims*, USA TODAY (May 18, 2023), https://www.usatoday.com/story/news/investigations/2023/05/18/k9-advantix-flea-tick-medicine-generic-bayer-tevra/70220325007/.

[2] *Id.*

[3] Le Coz & Hettinger, *supra* note 1.

4.     Elanco uses its monopoly power to exclude and foreclose other Imidacloprid producers and competitors from the market.  Elanco achieves this in significant part through a series of verbal "no generics" deals with the Retailer Defendants. These agreements promise to pay higher margins to the Retailer Defendants on the sale of Imidacloprid products if—and only if—the Retailer Defendants refuse to carry lower-cost generic alternatives.  The deals effectively force consumers into paying higher prices for Imidacloprid products, as the Retailer Defendants collectively constitute a dominant vertical distribution system for animal products generally.  As a result of this conduct, Elanco facilitates the unlawful fixing, stabilizing, and/or maintaining of the retail prices of Advantix Products, preserving Elanco's monopoly and supracompetitive profits for all Defendants.

5.     The overcharge damages to Plaintiff and Class members are significant.  For example, generic alternatives to Advantix Products often retail for approximately half the price at which Advantix Products are sold on the Retail Defendants' shelves .[4]

6.     Against this backdrop, Plaintiff brings this Action seeking redress for the harms caused by the conspiracy among Elanco and the Retailer Defendants to raise, fix, maintain and stabilize prices for Imidacloprid topicals in eh Relevant Market (defined below), and to maintain monopoly power in the Relevant Market. Plaintiff and class members seek actual damages, treble damages, injunctive relief, a declaratory judgment, reasonable costs and attorneys' fees, pre- and post-judgment interest, and such other relief as this Court deems just and proper.

## II.     JURISDICTION AND VENUE

7.     **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this Action arises out of §§ 1 and 2 of the Sherman Antitrust

---

[4] Le Coz & Hettinger, *supra* note 1.

Act (15 U.S.C. §§ 1 and 2), and §§ 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26), and because Plaintiff alleges violations of federal law.

8.     **Personal Jurisdiction.**   This Court has personal jurisdiction over Defendant Elanco under Section 12 of the Clayton Act, 15 U.S.C. § 22, as Elanco is incorporated and headquartered in Indiana, where this Court is located.

9.     The Court also has jurisdiction over the Retailer Defendants because they conduct substantial business in the United States, including this district, and their alleged anticompetitive conduct caused harm here. Personal jurisdiction is proper under the Clayton Act and due process principles.

10.     **Venue.**  This venue is proper pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and Defendants are subject to personal jurisdiction in this District.

## III.    PARTIES

### Plaintiff Susan Kraus-Silfen

11.     Plaintiff Susan Kraus-Silfen is a New York resident.

12.     Plaintiff has purchased Imidacloprid products, specifically Advantix Products, for her dog on numerous occasions from one or more of the Retailer Defendants from 2020 through the present day.  Plaintiff most recently purchased Advantix Products from Chewy on June 11, 2024, at a cost of $79.98.

13.     As a result of Defendants' price-fixing and monopolization scheme, Plaintiff paid significantly more for Imidacloprid products than she would have paid in the absence of the conspiracy detailed herein.  Plaintiff suffered from a critical loss of price competition, as the

Retailer Defendants each agreed to stifle competition in the Relevant Market (defined below), leading to higher prices for Plaintiff and class members.

### Defendant Elanco Animal Health, Inc.

14.     Defendant Elanco is an Indiana corporation with its principal place of business in Greenfield, Indiana.

15.     In August 2020, Elanco acquired Bayer Healthcare LLC's animal health and products division ("Bayer"), including the Advantix Products product line, in a transaction valued at $6.89 billion at close.[5]  Elanco, together with the Retailer Defendants, has continued to employ and benefit from the anticompetitive agreements originally established by Bayer in order to dominate the Imidacloprid product market in the United States, exclude other Imidacloprid topicals from being sold at the Retailer Defendants' stores, and increase and sustain prices.

### Defendant Chewy, Inc.

16.     Defendant Chewy is a Delaware corporation with its principal place of business in Plantation, Florida.

17.     Defendant Chewy is an online, e-commerce store specific to the sale of pet food, products and medication, including those products in the Relevant Market.

18.     Defendant has a significant market share for the distribution of pet products, including in the Relevant Market.

### Defendant Petco Health and Wellness Company, Inc.

19.     Defendant Petco is a Delaware corporation with its principal place of business located in San Diego, California.

---

[5]     *Elanco Closes Acquisition of Bayer Animal Health*, ELANCO (Aug. 3, 2020), https://investor.elanco.com/press-releases/press-releases-details/2020/Elanco-Closes-Acquisition-of-Bayer-Animal-Health/default.aspx.

20.     Defendant has a significant market share for the distribution of pet products, including in the Relevant Market.

### Defendant PetMed Express, Inc.

21.     Defendant PetMed is a Florida corporation with its principal place of business located in Delray Beach, Florida.

22.     Defendant PetMed runs an online pet specialty store called 1-800-PetMed.

### Defendant Tractor Supply Company

23.     Defendant Tractor Supply Company, owner of PetSense, is a Delaware corporation with its principal place of business located in Brentwood, Tennessee.

### Defendant PetSmart, Inc.

24.     Defendant PetSmart is a corporation with its principal place of business located in Phoenix, Arizona.

25.     Defendant PetSmart has a significant market share for the distribution of pet products, including in the Relevant Market.

## IV.    FACTUAL ALLEGATIONS

### *Relevant Market*

26.     <u>Relevant Product Market.</u>   The relevant market for analyzing the illegal acts committed by Defendants is the United States market for topical, squeeze-on flea-and-tick products for dogs and cats whose active ingredient is Imidacloprid— specifically as sold through the unique distribution channel of pet specialty stores in the U.S., including in the retail and e-commerce website channels of distribution offered by the Retailer Defendants (the "Relevant Market").

27.     This distribution channel constitutes a distinct antitrust market because pet specialty retailers, unlike general superstores or other outlets, cater to a core group of customers who prioritize specialized expertise, curated product selections, and superior customer service tailored to their pets' needs. The market's defining characteristics include its distinct pricing strategies, customer loyalty, and tailored marketing efforts that distinguish it from broader retail markets.

28.     Elanco's deliberate targeting of this channel, combined with its exclusion of competitors and maintenance of supracompetitive pricing, further underscores the channel's economic significance and distinctiveness. Courts have consistently recognized that submarkets with specialized vendors and dedicated customers constitute relevant antitrust markets due to their unique structure and competitive dynamics, which apply here.

29.     Imidacloprid products, moreover, are distinct. New compounds and pharmaceuticals are typically invented, patented and sold as improvements on existing products. Thus, while branded products and their generic alternatives are reasonable replacements for each other, products containing different (even if similar) compounds are not.  Additionally, branded products and their generic counterparts typically have high cross-elasticity of demand with each other, so markets with robust generic competition generally favor generics because they are created with the same active ingredient at a lower price point.  Absent evidence of high cross-elasticity of demand with other products, the branded product and its generic alternatives constitute a single-product market—one which excludes other products.  Single-product markets for chemicals and pharmaceuticals are common, and have often been recognized by courts around the country.

30.     Bayer, a predecessor of Elanco, has identified other, weaker substitutes for Imidacloprid topicals (*e.g.*, topicals made from a different active ingredient, Fipronil, sold under

the brand name Frontline). Fipronil products effectively kill fleas, ticks, and lice, but only after they bite pets, as they lack a repellent effect to prevent bites.[6] Bayer's own studies confirm as much[7] and show that these weaker substitutes do not constrain Bayer's ability to raise the price of Imidacloprid products (namely Advantix) above competitive levels. This confirms that these products are not in the Relevant Market.

31.    <u>Vertical Distribution.</u>    The Retailer Defendants, as specialty pet store retailers, present themselves as a distinct and specialized distribution market. Unlike traditional big-box stores or general retail outlets, the Retailer Defendants employ knowledgeable staff, often including trained animal experts, to provide personalized advice on pet care, nutrition, and health. This expertise allows them to offer a higher level of customer service, fostering trust and loyalty among consumers seeking the best products for their pets. Additionally, the Retailer Defendants curate a focused selection of pet-specific products, emphasizing premium, high-quality items.

32.    By creating an environment centered on specialized knowledge and customer service, the Retailer Defendants cultivate a shopping experience that is uniquely tailored to the discerning needs of pet owners.

33.    Recognizing this specialized distribution market, consumers conduct nearly three-quarters of purchasers of pet products, including Imidacloprid products like Advantix Products, in pet specialty retailers like the Retailer Defendants. Defendants know that consumers learn about products through the Retailer Defendants, and, therefore, if consumers in the Relevant Market are foreclosed from new products by the Retailer Defendants, it is likely that they would never know

---

[6] Le Coz & Hettinger, *supra* note 1.

[7] D.R. Young, Robert G. Arther & Wendell Davis, *Evaluation of K9 Advantix (TM) vs. Frontline Plus (R) Topical Treatments to Repel Brown Dog Ticks (Rhipicephalus sanguineus) on Dogs*, 90 PARASITOLOGY RESEARCH S116, S116-18 (2003), https://doi.org/10.1007/s00436-003-0908-4.

that other Imidacloprid products are not only as good, but better than the ones manufactured by Elanco.

34.    <u>The Hypothetical Monopolist Test.</u>  The Relevant Market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test."  The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist.  If the SSNIP is profitable, the market is properly defined.  If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

35.    Here, the SSNIP test is amply satisfied.  Defendants' "no generics" agreements force consumers to overpay several millions of dollars each year for Imidacloprid topical products. This conduct raises prices, throttles competition, and reduces consumer choice—and yet the resulting price increases are insufficient to drive customers out of the Relevant Market. Defendants' conduct results in profits far exceeding those of a hypothetical SSNIP.

36.    <u>Relevant Geographic Market.</u>  The geographic market for analyzing the antitrust violations alleged herein is the entirety of the United States.

37.    Manufacturers of Imidacloprid topicals sell those products to the Retailer Defendants throughout the United States, as well as to other distributors and smaller sellers who also sell Imidacloprid products.  Because Imidacloprid products can only be sold with approval of the United States Environmental Protection Agency, products in the Relevant Market can only be

imported or sold by companies that register to do so.[8]    This regulatory restraint limits the geographic market to the United States.

38.    <u>Monopoly Power</u>.    Defendant Elanco has monopoly power over the sale of Imidacloprid products in the United States, representing as much as 85% of the Relevant Market.

39.    Additionally, with respect to the vertical distribution of Imidacloprid products, Chewy, Petco, and PetMed collectively represent a dominant market share (roughly 75%) of Imidacloprid topical sales by retailers; and Petco, PetSense and PetSmart collectively represent a dominant market share (roughly 70%) of Imidacloprid topical sales by in-store pet specialty retailers.

## *The Imidacloprid Products*

40.    In 2002, Bayer acquired its monopoly when it sought and obtained a ten-year period of "exclusivity" by registering Imidacloprid formulations with the United States Environmental Protection Agency.[9] Bayer also sought and obtained legal protection for its monopoly by obtaining United States patents on its Imidacloprid products.

41.    The insecticides used as active ingredients in flea and tick treatments for household, domesticated animals (cats and dogs, namely) are regulated under the United States Environmental Protection Agency ("EPA") under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA").[10]    FIFRA requires that producers and manufacturers of insecticides register each formulation before offering it for sale in the United States.[11]

---

[8] *See* 7 U.S.C. § 136a, *et seq.*; *Importing and Exporting Pesticides and Devices*, EPA, https://www.epa.gov/compliance/importing-and-exporting-pesticides-and-devices?utm_source=chatgpt.com (last updated Mar. 15, 2024).

[9] *Id.* ¶ 86.

[10] 7 U.S.C. § 136a, *et seq.*

[11] *Id.*

42.    If the EPA agrees to register the use of an insecticide for a particular purpose, the registering company has "exclusive use" of the data used to register that insecticide for that purpose, for a period of ten years following registration.[12]  That ten-year "exclusive use" period creating by FIFRA effectively gives the registering company a monopoly over that particular formulation.  Bayer's FIFRA exclusive use ten-year period for Imidacloprid formulations expired in 2012, allowing generic manufacturers to enter the market.

43.    In August 2020, Elanco acquired Bayer's animal health division, including its Imidacloprid products through its Advantix Products line.  Elanco purchased Bayer's assets for approximately $6.89 billion at close.[13]

### Elanco Forecloses Competition in the Relevant Market

44.    To sustain and expand its monopoly and generate supracompetitive profits, Elanco and the Retailer Defendants agreed to each exclude generic Imidacloprid topicals.  Such exclusionary conduct is typical of hub-and-spoke conspiracies, with Elanco serving as the "hub" coordinating the Retailer Defendants—the "spokes"—to ensure collective adherence. Elanco thus entered into verbal "no generics" deals with each Retailer Defendant.

45.     Through these agreements, Elanco shared some of its illegal profits to secure each Retailer Defendant's agreement not to offer generic Imidacloprid topicals—competition that would undercut the Retailer Defendants' pricing of the Advantix Products.

46.    Elanco engaged in direct negotiations with each Retail Defendant, offering to increase that respective Defendant's profits if it agreed to refuse to carry generic Imidacloprid topicals.  Leveraging its monopoly power and dominance in the Relevant Market, Elanco utilized

---

[12] 7 U.S.C. § 136a(c)(1)(F)(i).

[13] Elanco, *supra* note 8.

its control of Imidacloprid topicals (the Advantix Products) to foreclose generic competition. The scheme successfully insulated the Relevant Market from competition—Elanco's Advantix Products experienced repeated and unjustified price increases since at least 2011, all while eliminating generic alternatives that could constrain pricing.

47.     To perpetuate this monopolistic price-fixing scheme, Elanco requires the Retail Defendants to ban generic Imidacloprid from their shelves and shares in the profits of the unlawful conduct to ensure collective adherence with Elanco's scheme.

48.     The conspiracy generated profits for both Elanco and the Retail Defendants while harming consumers and businesses that ordered and purchased Advantix Products from the Retail Defendants because they were denied access to generic alternatives. The boycott of generics deprived consumers of lower-cost, equally effective alternatives, ensuring higher prices across the Relevant Market.

49.     Elanco is Bayer's assignee and successor in interest with respect to the Imidacloprid product line and the associated market conduct detailed herein. Elanco assumed Bayer's anticompetitive practices and expanded them post-acquisition. In August 2020, Elanco formally acquired Bayer's animal health division, including the rights, obligations, and assets associated with the Advantix Products and other Imidacloprid-based formulations, through a transaction valued at approximately $6.89 billion. On information and belief, this acquisition explicitly included all proprietary formulations, regulatory approvals, intellectual property rights, and distribution agreements related to the Imidacloprid product line.

50.     By virtue of this transaction, Elanco assumed Bayer's role in the market and inherited both the benefits and liabilities associated with Bayer's operations, including its anticompetitive practices.

51.     As Bayer's successor in interest, Elanco is bound by any agreements, commitments, and unlawful conduct initiated by Bayer. Elanco's continuation and expansion of Bayer's "no generics" agreements and exclusionary arrangements with Retailer Defendants demonstrate not only its adoption of Bayer's anticompetitive strategy but also its active participation in perpetuating and benefitting from the monopolistic conspiracy established by Bayer.

52.     Under established principles of corporate succession, Elanco bears legal responsibility for the actions of its predecessor, Bayer, as they relate to the Imidacloprid market and the ongoing harm caused by the anticompetitive conduct outlined in this action. This includes liability for any antitrust violations, price-fixing schemes, and market foreclosure practices that originated under Bayer's control and continue under Elanco's stewardship. Accordingly, Elanco stands in the shoes of Bayer for all purposes relevant to this litigation.

53.     Consistent with its role as ringmaster in the hub-and-spoke arrangement, Elanco—at the time, Bayer—made written presentations to Petco and PetSmart as early as August 2016, explicitly detailing the increased, supracompetitive profits that both Bayer and the Retailer Defendants could generate by keeping Imidacloprid off of their brick-and-mortar shelves and their online platforms.

54.     As a result of the 2016 presentation, Petco and PetSmart agreed to go along with Elanco's scheme, agreeing to offer only Advantix Products and removing all lower cost, more effective generic Imidacloprid alternatives from their stores.[14]  This is a classic price-fixing

---

[14] Le Coz & Hettinger, *supra* note 1 ("Cheaper equivalents for the blockbuster brands, which both kill and repel pests, have quietly eluded consumers for years. Even today, they're nowhere to be found at many of the biggest pet specialty stores, like PetSmart or Petco. And they're absent from popular online pet pharmacies like Chewy.com or PetMet Express.").

agreement: to exclude low-cost competitors from the market in order to keep profits at unlawfully high levels.

55.    Elanco's foreclosure of Tevra.    Elanco (and, previously, Bayer) has leveraged its dominant position and monopolistic tactics, as discussed above, in order to lock out generic competition in the Imidacloprid market. Elanco also employed multiple exclusionary strategies to maintain the Retailer Defendants' loyalty as distributors, including illegal discounting/rebates, bundling of products, and advertising funds—as if sharing supracompetitive profits for Advantix Products were not enough.

56.    In 2016, competitor Tevra created detailed sales forecasts for generic Imidacloprid topical products. Tevra identified a clear market opportunity to offer consumers a safer, more effective, and lower-cost alternative to Elanco's Advantix Products.

57.    Quickly, it became clear that Tevra's formulation of Imidacloprid topicals was more effective than the Advantix Products. While both topicals contain the same active ingredient, Imidacloprid, Tevra's method of delivering that active ingredient to the skin of the respective animal is superior to Advantix Products. As a result of the described hub-and-spoke agreement, consumers lacked access to a more effective and safer product.

58.    Controlled experiments have demonstrated that Tevra's Imidacloprid topicals kill over 99% of fleas, just as Advantix Products do. However, Tevra's Imidacloprid topicals also kill ticks more effectively than do Advantix Products. Further, Tevra's Imidacloprid topicals are less toxic than are Advantix Products, making them safer for pets' consumption and use.

59.    Despite the obvious advantages, Tevra's attempts to introduce its superior generic alternative were systematically blocked by Elanco's hub-and-spoke scheme. Tevra attempted to sell its generic Imidacloprid topical to the Retailer Defendants, several of which were already

carrying other Tevra products.  But in accordance with their deliberate and coordinated effort to suppress competition and protect Elanco's monopoly profits, the Retailer Defendants refused to carry Tevra's generic Imidacloprid topical.[15]

60.    In a normal functioning, competitive market, Imidacloprid suppliers could successfully market and sell their Imidacloprid products to the Retailer Defendants.  No pro-competitive reason exists for the absence of any sale of a generic alternative by the Retailer Defendants except for Elanco's price-fixing scheme to conspire amongst its vertical distributors to fix the prices of Advantix Products and maximize all of Defendants' profits. Defendants' vertical agreements collectively suppressed competition and ensured that all participants benefitted at the expense of consumers.

61.    Each of the Retailer Defendants agreed to participate in the hub-and-spoke boycott of Imidacloprid products produced by Tevra:

| RETAILER | FORECLOSURE OF TEVRA |
|---|---|
| CHEWY | Tevra tried to sell Imidacloprid products through Chewy beginning in 2016, but was rebuffed in 2017, July 2018, October 2018, and in 2019 because of the pre-existing agreement with then-Bayer. |
| PETCO | Tevra tried to sell Imidacloprid products through Petco in 2018 and, specifically in summer of 2018, when they were told that they could not because of the pre-existing agreement with then-Bayer. |
| PETMED EXPRESS | Tevra tried to sell Imidacloprid products through PetMed Express in 2018 and 2018, but was told they could not because PetMed's "program with Bayer [included] not allowing any generic equivalents." |

---

[15] Le Coz & Hettinger, *supra* note 1.

| **RETAILER** | **FORECLOSURE OF TEVRA** |
|---|---|
| PETSENSE | Tevra tried to sell Imidacloprid products through Petsense, but was told after February and March 2017 meetings that their distributor (Bayer) forbade it. |
| PETSMART | Tevra tried to sell Imidacloprid products through PetSmart beginning in 2016, but was rebuffed because of the pre-existing agreement with then-Bayer. |

62.    Each Retailer Defendant ultimately agreed through its contracts and verbal agreements with Bayer to foreclose Tevra, a more effective and cheaper Imidacloprid product, from the Relevant Market.

63.    The Retailer Defendants' collective refusal to stock Tevra's products was not only against their individual self-interest in a competitive market but was also critical to maintaining the unified suppression of generics, which preserved inflated prices and supracompetitive profits for all parties involved.

64.    The Retailer Defendants also noted that, if they decided to part with then-Bayer's price-fixing agreements, they would lose critical access to marketing and advertising funding as well as lucrative rebates on Advantix Products.  These rebates and funds functioned as economic leverage used by Bayer (now Elanco) to secure retailer compliance with the scheme. These agreements insulated Elanco's market share by eliminating competition, ensuring that no Retailer Defendant could unilaterally break ranks without substantial financial and competitive repercussions.

65.    The price-fixing and monopolization scheme of Elanco and the Retail Defendants has been remarkably successful.  Tevra's Imidacloprid products remain entirely foreclosed from the Relevant Market because of Defendants' coordinated efforts.  As of the date of this filing, no

Imidacloprid generic products are sold by the Retailer Defendants in competition with the Advantix Products. By aligning their actions through Elanco's oversight, the Retailer Defendants ensured no competitor could disrupt the artificially high pricing structure, directly injuring consumers and stifling competition in the Relevant Market.

*Antitrust Injury*

66.    Elanco's anticompetitive agreements and conduct have had the following effects: (1) inflated prices that would not have existed but for the Defendants' unlawful conduct, (2) foreclosure of the Relevant Market to low-cost alternatives and other competitors who would have otherwise driven prices downward, and (3) elimination of price competition between the Retail Defendants, who allowed supracompetitive prices to harm consumers while normal price competition would have otherwise driven prices downward.

67.    Harm to Consumers.  Consumers are and were harmed as a result of the Defendants' actions.

68.    Consumers suffered in the form of supracompetitive prices, which are often double or triple the price of other Imidacloprid products.  Currently, on Amazon, Tevra's Activate II Flea and Tick Prevention Imidacloprid product retails for $26.97 for a four-month supply in a dosage large enough for an "extra large" dog (55+ pounds).[16] The monthly cost for Tevra's product comes to $6.74.  In comparison, a six-month supply for Advantix's non-generic Imidacloprid product for

---

[16] *TevraPet Activate II Flea & Tick Prevention for Dogs, Extra Large (55+ Pounds)*, AMAZON, https://www.amazon.com/TevraPet-Activate-Topical-Extra-Pounds/dp/B06XKH9MRK?ref_=ast_sto_dp&th=1&psc=1 (last visited Dec. 19, 2024).

the same size dog costs $79.98 on Chewy's website,[17] $79.98 on Petco's website,[18] $79.99 on PetSmart's website,[19] $79.99 on Petsense's website,[20] and $79.98 on PetMed's website.[21]  The monthly cost from using Advantix's product comes to $13.33—nearly double. Clearly, there is an intense lack of price competition in the Relevant Market—and the Retailer Defendants do not compete on price at all with each other, with every single offering of Advantix Products' being the exact same price.

69.    Additionally, by driving Tevra from the Relevant Market, the Retail Defendents collectively are forcing less effective, less safe products onto consumers because of their exclusivity agreements with Elanco—which compose a wider hub-and-spoke arrangement between them and Elanco.  Finally, consumers are harmed by the lack of competition, both product and price competition, which are deleterious to the Relevant Market as a whole, threatening any incentive to innovate or create better products.

70.    Elanco's monopoly power and its command over the vertical chain of distribution in the Relevant Market nullifies any competition in the Relevant Market, preserving Elanco's dominance and Defendants' shared supracompetitive profits.

---

[17] *K9 Advantix II Flea & Tick Spot Treatment for Dogs, over 55 lbs, 6 Doses (6-mos. supply)*, CHEWY, https://www.chewy.com/k9-advantix-ii-flea-tick-spot/dp/102309 (last visited Dec. 19, 2024).

[18] *K9 Advantix II Vet-Recommended Flea, Tick & Mosquito Treatment & Prevention for X-Large Dogs, Count of 6*, PETCO, https://www.petco.com/shop/en/petcostore/product/k9-advantix-ii-topical-extra-large-dog-flea-and-tick-treatment (last visited Dec. 19, 2024).

[19] *K9 Advantix® II Over 55 lbs Dog Flea & Tick Treatment*, PETSMART, https://www.petsmart.com/dog/flea-and-tick/spot-ons/k9-advantix-ii-over-55-lbs-dog-flea-and-tick-treatment-30514.html (last visited Dec. 19, 2024).

[20] *K9 Advantix II XL Dog Vet-Recommended Flea, Tick & Mosquito Treatment & Prevention | Dogs Over 55 lbs.*, PETSENSE, https://www.petsense.com/products/k9-advantix-ii-extra-large-dog?variant=40356683284545 (last visited Dec. 19, 2024).

[21] *K9 Advantix II - Flea & Tick Topical for Dogs*, PETMEDS, https://www.1800petmeds.com/k9+advantix+ii+-prod10631.html (last visited Dec. 19, 2024).

71.    <u>Harm to Competition.</u>  Competitors are and were harmed as a result of Defendants' actions.

72.    Defendants' web of exclusivity agreements locks out would-be competitors (like Tevra) from the vast majority of the vertical chain of distribution in the Relevant Market. Additionally, Elanco's monopoly power is impenetrable because of all Defendants' collective willingness to agree to anticompetitive, cartel conduct which forecloses new entrants into the Relevant Market.

## V.    CLASS ACTION ALLEGATIONS

73.    Plaintiff brings this Action on behalf of herself as a Class Action maintainable under Federal Rule of Civil Procedure 23, seeking actual and treble damages, equitable and injunctive relief and other allowable relief on behalf of the following class:

> **Nationwide Class**.  All persons or businesses in the United States who, during the statutory period, purchased Elanco's Advantix Products from one or more of the Retailer Defendants.

74.    Excluded from the Class are Defendants, their officers, directors and employees; any entity in which Defendants have a controlling interest; and any affiliate, legal representative or assignee of Defendants.  Also excluded from the Class is any judicial officer presiding over this Action.

75.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

76.    <u>Numerosity.</u>  The Nationwide Class is so numerous that joinder would be impracticable, as there are (at a bare minimum) many tens of thousands of Class members

77. <u>Commonality</u>.  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members.  These common questions of law and fact include, without limitation:

      a.  Whether the Defendants violated the antitrust laws;

      b.  Whether the Defendants engaged in a combination or conspiracy among themselves to fix, raise, maintain, or stabilize prices in the Relevant Market within United States and its territories;

      c.  Whether the Defendants engaged in a combination or conspiracy among themselves to monopolize the Relevant Market within United States and its territories;

      d.  Whether the Defendants agreed to unreasonably restrain trade in violation of federal and state antitrust laws;

      e.  The scope and duration of the alleged conspiracy;

      f.  Whether the Defendants engaged in anticompetitive conduct;

      g.  Whether Plaintiff and class members were harmed;

      h.  Whether Plaintiff is entitled to declaratory relief and injunctive relief to end Defendants' conduct; and

      i.  Whether Plaintiff and Class members are entitled to damages and other relief.

78. <u>Typicality</u>.  Plaintiff's claims are typical of those of other Class members because Plaintiff, like every other Class member, was harmed by way of the anticompetitive conduct as alleged herein.  Plaintiff, like all other Class members, was injured by Defendant's uniform conduct.  Plaintiff is advancing the same claims and legal theories on behalf of themselves and all other Class members, such that there are no defenses unique to Plaintiff.  The claims of Plaintiff

and those of the other Class members arise from the same operative facts and are based on the same legal theories.

79.    <u>Adequacy of Representation</u>.    Plaintiff will fairly and adequately represent and protect the interests of the Class members in that she has no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class.    The damages and infringement of rights that Plaintiff suffered are typical of other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class.    Plaintiff has retained counsel experienced in antitrust class action litigation, and Plaintiff intends to prosecute this action vigorously.

80.    <u>Superiority of Class Action</u>.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class' common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts.    In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

81.    The litigation of the claims brought herein is manageable.    Defendants' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

82.    Adequate notice can be given to Class members directly using information maintained in the parties' records.

83.    <u>Predominance</u>.  The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

84.    This proposed class action does not present any unique management difficulties.

## <u>COUNT I</u>

VIOLATIONS OF THE SHERMAN ACT, SECTION 1

(AGAINST ALL DEFENDANTS)

85.    Plaintiff realleges and repeats each and every allegation as if fully set forth herein.

86.    The Defendants formed an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act, (15 U.S.C. § 1) to raise, fix, maintain, or stabilize prices in the Relevant Market.

87.    Since at least 2016, Defendants agreed with each other to the agreements and conduct detailed herein.  The agreement was intended to and did unreasonably restrain trade, suppress competition, and have had the likely and actual effect of raising, fixing, maintaining, or stabilizing prices in the Relevant Market in the United States in violation of Sections 1 of the Sherman Act (15 U.S.C. § 1).

88.    This conduct is unlawful under the *per se* standard.  Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications.  Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

89.    Plaintiff and Class members were injured by Defendants' agreement that unreasonably restrained trade and raised, fixed, maintained, or stabilized prices of Imidacloprid

products at artificially high levels.  Plaintiff and Class members paid higher prices for Imidacloprid products than they would have in the absence of Defendants' violations of Sections 1 of the Sherman Act.

90.    Plaintiff seeks a declaratory judgment and injunctive relief consistent with this cause of action, as well as actual damages, treble damages, reasonable costs and attorneys' fees, and pre- and post-judgment interest.

## **COUNT II**

VIOLATIONS OF THE SHERMAN ACT, SECTION 2

(AGAINST ALL DEFENDANTS)

91.    Plaintiff realleges and repeats each and every allegation as if fully set forth herein.

92.    At all relevant times, Elanco, in concert with the Retailer Defendants, has intentionally engaged in a conspiracy to acquire, maintain, or attempt to maintain monopoly power in the Relevant Market through a course of anticompetitive conduct and exclusionary agreements.

93.    Elanco possesses monopoly power in the Relevant Market, which it has leveraged to coordinate and enforce the anticompetitive conduct described herein.

94.    Elanco and the Retailer Defendants conspired to acquire, maintain and increase monopoly power in the Relevant Market by entering into agreements and engaging in a concerted effort to exclude generic Imidacloprid alternatives. This conspiracy included:

　　　a. The creation and enforcement of exclusive dealing arrangements whereby the Retailer Defendants agreed to foreclose competing products in exchange for economic incentives, including rebates, advertising funds, and shared profits from supracompetitive pricing.

b. The systematic exclusion of competitors, such as Tevra, through coordinated refusals to carry lower-cost, more effective generic Imidacloprid products.

c. A unified agreement, orchestrated by Elanco as ringmaster, ensuring that all Retailer Defendants adhered to the conspiracy, thereby maintaining collective supracompetitive profits at the expense of competition and consumer choice.

95.    The conspiracy to monopolize the Relevant Market included overt acts in furtherance of the conspiracy, including:

a. Elanco's explicit agreements with each Retailer Defendant to foreclose generics in exchange for financial benefits.

b. The Retailer Defendants' refusals to purchase or sell generic Imidacloprid alternatives, as detailed in their verbal and written agreements with Elanco.

c. The use of economic coercion, including the threat of lost advertising funds and rebates, to compel continued compliance with the conspiracy.

96.    As a direct and proximate cause of Defendant's conspiracy to monopolize, Plaintiff and Class members have been injured in their business and property. These injuries include paying artificially inflated prices for Advantix Products and being deprived of the opportunity to purchase lower-cost, equally effective alternatives.

97.    Defendants' conspiracy to monopolize constitutes conduct specifically intended to eliminate competition, maintain monopoly power, and harm consumers.

98.    Plaintiff seeks a declaratory judgment and injunctive relief consistent with this cause of action, as well as actual damages, treble damages, reasonable costs and attorneys' fees, and pre- and post-judgment interest.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class identified herein, respectfully asks this Court for:

a.) An order certifying the Class pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3), directing that reasonable notice of this Action, as provided by Federal Rule of Civil Procedure 23(c)(2) be given to the Class, appointing Plaintiff as representative of the Class, and appointing Plaintiff's counsel as class counsel for the Class;

b.) A judgment against Defendants, and in favor of Plaintiff and the Class, holding Defendants liable for the antitrust violations as alleged herein;

c.) A declaratory judgment, declaring that the agreements among Elanco and the Retailer Defendants were made for illegal, anticompetitive purposes, were an unreasonable restraint of trade, and had anticompetitive effects on the Relevant Market in violation of the antitrust laws;

d.) An award to the Plaintiff and the Class of actual, treble, and exemplary damages as permitted plus interest in accordance with the law;

e.) An award of such equitable relief as is necessary to correct for the anticompetitive market effects as caused by Defendants' unlawful conduct, including disgorgement, restitution, and the creation of a constructive trust;

f.) An award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' fees; and

g.) All such further relief as it may deem just and proper.

## VII.   JURY TRIAL DEMAND

99.    Plaintiff and members of the Class demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

**DATED**: <u>January 24, 2025</u>                    Respectfully submitted,

/s/ *Scott D. Gilchrist*
Scott D. Gilchrist
(Atty. No. 16720-53)
Edward B. Mulligan
(Atty. No. 29400-53)
**COHEN MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN  46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2593
sgilchrist@cohenandmalad.com
nmulligan@cohenmalad.com

Israel David
Adam M. Harris
**ISRAEL DAVID LLC**
17 State Street, Suite 4010
New York, New York 10004
Telephone: (212) 739-0622
israel.david@davidllc.com
adam.harris@davidllc.com

Jennifer Czeisler*
Edward Ciolko*
Arturo Peña Miranda*
**STERLINGTON, PLLC**
One World Trade Center, 85th Floor
New York, New York 10007
Telephone: (929) 709-1493
jen.czeisler@sterlingtonlaw.com
ed.ciolko@sterlingtonlaw.com
arturo.pena@sterlingtonlaw.com

***Attorneys for Plaintiff Kraus-Silfen
and the Proposed Class***

*\*Pro Hac Vice Forthcoming*